JUDGE RAKOFF

381-08/MEU/SL
FREEHILL HOGAN & MAHAR, LLP
Attorneys for Plaintiff
PENGUIN MARITIME LTD.
80 Pine Street
New York, NY 10005
(212) 425-1900
(212) 425-1901 fax
Michael E. Unger (MU 0045)

08 CIV 6570

RECEIVED
JUL 24 2008
U.S.D.C. S.D. N.Y.
CASHIERS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

PENGUIN MARITIME LTD.,

        Plaintiff,

-against-

LEE & MUIRHEAD LTD., a/k/a LEE & MUIRHEAD PVT LTD.,

        Defendant.

08 Civ _____ (___)

**VERIFIED COMPLAINT**

---

Plaintiff PENGUIN MARITIME LTD. (hereinafter "PENGUIN") for its Verified Complaint against Defendant LEE & MUIRHEAD LTD., a/k/a LEE & MUIRHEAD PVT LTD. (hereinafter "L&M") alleges upon information and belief as follows:

1. This is an admiralty and maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure in that it involves a claim for maritime tort and/or breach of maritime contract. This case also falls under this Court's admiralty and maritime jurisdiction pursuant to 28 U.S.C. §1333.

2. At all times material hereto, Plaintiff PENGUIN was and still is a foreign business entity duly organized and existing under the laws of a foreign country with an address at 80, Broad Street, Monrovia, Liberia.

NYDOCS1/308332.1

3. At all times relevant hereto, Defendant L&M was and still is a foreign business entity duly organized and existing under the laws of a foreign country with an address at 12 K. Dubhash Marg, 3rd Floor, Orion House, Mumbai 400 021, India.

4. By a maritime contract of charter party dated September 3, 1996, Plaintiff PENGUIN, as owner, chartered the M/V LISSOM, to non-party Inglewood Gestion S.A. (hereinafter "Inglewood"), as charterer, to carry a cargo of 7,000 metric tons of bagged rice from Haldia to West Africa.

5. Pursuant to the terms of the charter, non-party Inglewood nominated Defendant L&M to act in the capacity of agents for Plaintiff PENGUIN while the vessel was at the port of Haldia (near Calcutta, Bangladesh).

6. As agents for PENGUIN, Defendant L&M had a duty to further the interests of PENGUIN and its vessel by ensuring that the cargo was ready to load onto the vessel well in advance (usually before the vessel arrived at port) so as to prevent PENGUIN from incurring precipitated costs, charges and expenses.

7. On September 12, 1996 at 0730 hours, the M/V LISSOM arrived at Haldia anchorage and issued her formal notice of readiness.

8. Unbeknownst to PENGUIN, prior to the vessel's arrival, Defendant L&M, as agents for PENGUIN, attended a meeting held by the port authorities on September 11, 1996, during which L&M represented to the port authorities that the vessel would be issuing "clean mates receipts" in respect to the cargo of bagged rice that was to be loaded aboard at Haldia. By taking on such an undertaking on behalf of PENGUIN without giving notice to or obtaining permission from PENGUIN of the same, L&M acted outside the scope of its authority as agents for PENGUIN.

9. The vessel's notice of readiness was not accepted by Defendant L&M until September 13, 1996 at 1740 hours.

10. In breach of its duty to ensure the cargo was ready to load upon the vessel's arrival, L&M failed to have the cargo carted in advance. On September 13, 1996, when the vessel was ready to receive the contemplated cargo, the M/V LISSOM was unable to commence loading operations. By a letter dated September 15, 1996, Defendant L&M notified the vessel's Master that the bagged rice cargo could not be carted because surveyors had found the cargo to be in a condition unfit for ocean transport.

11. By a letter received September 17, 1996, the Haldia dock complex ordered the vessel to vacate the berth so as to allow other vessels waiting in line an opportunity to berth. As such, the vessel was forced to return to anchorage and wait for a second turn to berth.

12. On September 29, 1996, the vessel was allowed to berth and thereafter, she commenced loading operations the bagged rice cargo. The Master surveyed the condition of the cargo being loaded and found it to be infested with live insects. Accordingly, the Master issued two letters of protest stating: (1) the bags had hook marks in various places and the same were partially stitched; (2) some bags were stained and dirty; (3) spillage had occurred due to weak packing; (4) bags were of poor quality; and (5) live insects were found in open bags making the contents thereof unsuitable for human consumption. The Master also threatened to cease loading operations until the matter was amicably resolved so as to protect the interest of PENGUIN and exonerate the vessel form any potential claims at the discharge port at West Africa.

13. Based on the condition of the cargo being loaded, it was clear that Defendant L&M had not appointed surveyors to inspect the cargo.

14. Due to the continuing presence of heavy infestation of live insects, the Master ceased loading operations on October 3, 1996 and appointed surveyors to inspect the cargo.

15. As a result, on October 6, 1996, the vessel was ordered to move out of berth and wait double-banked within the dock area until the cargo issues were resolved.

16. Cargo surveyors, non-party Brigs and Company, attended on board the vessel on October 11, 1996 and drew bulk composite samples from holds Nos. 1, 3 and 5. The samples were tested in accordance with the Food and Adulteration Act, 1955 as required by statutory law. By a report dated October 11, 1996, Analytical Consulting and Technical Chemists issued the results of the testing which found that "the grain is infested with insects, weevils and larvae, so the grain is not fit for human consumption". Based on the test results, the quality of the cargo was below the requirements of the buyer in West Africa. The test results also revealed that Defendant L&M failed to have a phythosanitary certificate issued for the cargo prior to loading which was contrary to accepted procedure for loading cargo of that nature at the time.

17. Notwithstanding the condition of the cargo, Defendant L&M was putting pressure on the Master to issue clean mates receipts so that clean bills of lading could then be issued.

18. Ultimately, the cargo that had been loaded on board the vessel had to be discharged and no further cargo was to be loaded from the consignment. The discharge operations further delayed the vessel and were constantly being interrupted because the port authorities ordered the vessel to vacate the berth whenever any other vessel needed to use that berth. As a result, the discharge operations were not completed until December 27, 1996.

19. Meanwhile, Defendant L&M breached its duty to protect the interest of PENGUIN and the M/V LISSOM by doing nothing to assist PENGUIN vis-à-vis the port authorities/cargo interests. L&M did not explain to the port authorities why the vessel could not

issue "clean mates receipts" or clarify the fact that it was not authorized to make such a representation on behalf of PENGUIN in the first instance.

20.     Owing to L&M's breaches of duty to PENGUIN, the vessel suffered unprecedented delays and as such, PENGUIN incurred the following costs/expenses and losses:

- $211,377.56 by way of charges for pilotage, berth, hire port dues, shifting penalties, and agency fees;

- $55,459.10 in respect of bunkers consumed; plus

- $688,800[1] for loss of use of the vessel from October 6 to December 21, 1996 (a total period of 76 days),

which amounts to a sum total of $935,636.66.

21.     Despite due demand, Defendant L&M paid no part of the $935,636.66 in costs/expenses and losses incurred by PENGUIN for which L&M is fully liable.

22.     In 1998, PENGUIN commenced Suit No. 826 against Defendant L&M before the Bombay High Court of Judicature to recover damages in the amount of $935,656.66 (plus interest at the rate of 18% per annum awardable under the governing law) caused by L&M's breach of duties as the vessel's agent.

23.     Suit No. 826 has been pending adjudication before the Bombay High Court for 10 years. Over the course of the 10 year period to date, PENGUIN's initial claim of $935,656.66 continues to accrue interest at the rate of 18% per annum and as such, PENGUIN's principle claim totals $2,619,782.65.

24.     Interest anticipated to accrue over the next two years (the minimum estimated time for completion of the Bombay proceedings) is $336,829.19.

---

[1] This figure is based on the amount the vessel would have made under a charter party PENGUIN had fixed for the vessel, but for the delays. Pursuant to that charter, the vessel would have earned a daily hire rate of $8,800 over a charter period of 76 days.

25. In all, the claim for which Plaintiff PENGUIN sues in this action, as near as presently may be estimated, totals **$2,956,611.84**, no part of which has been paid by Defendant L&M, despite due demand. Plaintiff PENGUIN specifically reserves its right to amend this figure and to seek an increase in the amount of security should such sum appear to be insufficient to fully secure PENGUIN.

**Request for Rule B Relief**

26. Upon information and belief, and after investigation, Defendant cannot be "found" within this District for the purpose of Rule B of the Supplemental Rules of Certain Admiralty and Maritime Claims, but Plaintiff believes that Defendant has, or will shortly have, assets within this District comprising, *inter alia*, cash, funds, escrow funds, credits, debts, wire transfers, electronic funds transfers, accounts, letters of credit, freights, sub-freights, charter hire and/or sub-charter hire, of, belonging to, due or for the benefit of Defendant LEE & MUIRHEAD LTD., a/k/a LEE & MUIRHEAD PVT LTD. (collectively hereinafter, "ASSETS"), including but not limited to ASSETS in either of its names and/or being transferred for its benefit at, moving through, or being transferred and/or wired to or from banking institutions or such other garnishees who may be served with a copy of the Process of Maritime Attachment and Garnishment issued herein.

27. The total amount sought to be attached pursuant to the above is **$2,956,611.84**.

WHEREFORE, Plaintiff PENGUIN MARITIME LTD. prays:

a. That process in due form of law according to the practice of this Court may issue against Defendant citing it to appear and answer the foregoing;

b. That if Defendant cannot be found within this District pursuant to Supplemental Rule B that all tangible or intangible property of Defendant up to and including

**$2,956,611.84** be restrained and attached, including, but not limited to any cash, funds, escrow funds, credits, debts, wire transfers, electronic funds transfers, accounts, letters of credit, freights, sub-freights, charter hire and/or sub-charter hire, of, belonging to, due or being transferred from or for the benefit of Defendant LEE & MUIRHEAD LTD., a/k/a LEE & MUIRHEAD PVT LTD., including but not limited to ASSETS in its name and/or being transferred for its benefit at, through, or within the possession, custody or control of such banking institutions and/or any such other garnishees who may be served with a copy of the Process of Maritime Attachment and Garnishment issued herein;

c. That this Court retain jurisdiction over the matter for any further or supplemental proceedings as may be necessary, including but not limited to the recognition and enforcement of any award entered against the Defendant in the Bombay proceedings; and

d. For such other, further and different relief as this Court may deem just and proper in the premises.

Dated: New York, New York
       July 24, 2008

FREEHILL HOGAN & MAHAR, LLP
Attorneys for Plaintiff
PENGUIN MARITIME LTD.

By: _____
    Michael E. Unger (MU 0045)
    80 Pine Street
    New York, NY 10005
    (212) 425-1900
    (212) 425-1901 (fax)

## ATTORNEY VERIFICATION

State of New York  )
                   ) ss.:
County of New York )

MICHAEL E. UNGER, being duly sworn, deposes and says as follows:

1. I am a partner with the law firm of Freehill Hogan & Mahar, LLP, attorneys for Plaintiff in this action, I have read the foregoing Verified Complaint and know the contents thereof, and the same is true to the best of my knowledge, information and belief.

2. The sources of my information and the grounds for my belief are communications, information and documentation provided by our client and/or by solicitors representing our client, and independent investigations conducted by this office.

3. The reason this verification is made by an attorney and not by the Plaintiff is because the Plaintiff is a foreign entity, none of whose officers are presently within this Judicial District.

_____
Michael E. Unger

Sworn to before me this
24th day of July, 2008

_____
Notary Public
MELISSA COLFORD
Commissioner of Deeds
City of New York-No. 5-1692
Certificate Filed in New York
Commission Expires 4/1/10